The People of the State of New York, Respondent, v. Jerry Roth, Appellant.

First Department, June 22, 1961.

296

*Murray A. Gordon* for appellant.

*Walter E. Dillon* of counsel (*Isidore Dollinger, District Attorney*), for respondent.

EAGER, J. This is an appeal from a judgment of the County Court, Bronx County, convicting the defendant of the crime of murder in the first degree, with recommendation of life imprisonment.

On the record here, it is established beyond a reasonable doubt that the defendant did brutally kill a 10-year-old girl in connection with his rape or attempted rape of her. By way of defense, however, it was urged that the defendant, at the time of the commission of the crime, was insane within the meaning of section 1120 of the Penal Law. The issue as to his alleged insanity was submitted to the jury upon a fair and proper charge. The finding of the jury upon this issue against the defendant has ample support in the record. In addition to proper and relevant hospital records and the testimony of the psychiatrists called by the People, tending to establish that he was of such mental capacity as to be charged with responsibility for his acts, the defendant himself, on cross-examination, gave testimony clearly indicating that he knew the nature and quality of his acts and that they were wrong.

The defendant claims prejudicial error in the reference upon the trial to the post-crime records of the Bellevue Hospital in connection with his commitment there pursuant to sections 658 *et seq.* and 870 of the Code of Criminal Procedure; and, particularly, it is urged that reversible error was committed in the receiving into evidence upon the trial of the official report of

the psychiatrists, dated January 20, 1959, transmitted pursuant to section 662 of the Code of Criminal Procedure. It is significant that the records and the psychiatrists' report were not initially brought into the case by the People. The People had rested, and a motion to dismiss the indictment on the ground that the People had failed to make out a prima facie case had been denied. Then, as a part of defendant's case, the defendant offered in evidence all the records of the Bellevue Hospital appertaining to his care and treatment there. These records, as offered by defendant, covered various periods of defendant's care and treatment at this hospital from 1948, and included the post-crime records while he was there under observation pursuant to the post-crime commitment. A copy of the January 20, 1959 report of the psychiatrists was with these records offered by the defendant but there was no specific reference to such report in connection with the defendant's offer. · The complete records, including the copy of the report were received and marked as a single exhibit, defendant's "Exhibit 1".

The mere general offer by the defendant of the Bellevue Hospital records into evidence, and the admission thereof by the trial court pursuant to such offer, would not operate to preclude the defendant from thereafter objecting to a reference to or the use of incompetent parts of the record or the psychiatrists' report. Upon later or timely objection by the defendant, it is clear that incompetent parts of the record and the report should have been excluded. In fact, it is customary, on the trial of a case, for counsel to offer and for the court to receive hospital records as an exhibit on a tentative basis, that is, with the understanding that counsel may thereafter point out to the court and have excluded specific portions thereof which are incompetent. Of course, then it is the duty of counsel, if he has objection to any part of the exhibit, to specifically make the same known to the court. It is not the duty of the court to take the initiative in this connection; and, in the absence of proper and timely objection by counsel, the exhibit, in its entirety, as marked, is to be deemed in evidence and completely and without restriction before the court and jury for all purposes.

Such objection as there was here to the initial admission of the Bellevue Hospital's records, including the attached copy of the psychiatrists' report, was by the People. The People generally objected. The court thereupon ruled that defendant's counsel would be permitted to read a particular statement from the exhibit and that he would later pass upon other portions of the exhibit as questions were raised with reference

thereto. Such ruling was a proper one. Later, the Assistant District Attorney interrupted and repeated his objection to the use of the records, stating in effect that a doctor or psychiatrist should be called to explain portions of the records so as not to "just leave them up in the air for the jurors among themselves to conclude". The defendant, however, took the position then "that we have a right to read all of these records into evidence * * * I think we now have the right to read the entire record in". The court finally ruled that it would permit "any portion of the record to be read to the jury at this time" and defendant's counsel agreed, saying "Thank you".

It is clear that the post-crime Bellevue Hospital records, independent of the psychiatrists' report, were properly receivable in evidence where offered by the defendant. In fact, where so offered, it would have been error for the court to have excluded them. (See *People v. Samuels*, 302 N. Y. 163, 172; *People v. Draper*, 278 App. Div. 298, affd. 303 N. Y. 653.) Of course, the report to the court of the examining psychiatrists was not admissible. This is so by virtue of the express provisions of section 662 of the Code of Criminal Procedure, that the "report of the psychiatrists made pursuant to this section shall not be received in evidence upon the trial of the defendant but shall be filed by the court in the office of the clerk of the court where it shall be subject to inspection only on an order of the court or a justice thereof."

There is nothing in the record here to indicate that the inclusion of the copy of the psychiatrists' report in the exhibit as offered by the defendant was due to counsel's inadvertence. The paper was such that it could very well be considered as properly a part of the hospital records in that it set forth the final diagnosis, based on the records, by doctors in authority. Certainly, it is to be assumed that counsel for the defendant knew that a copy of the psychiatrists' report was with the records, and he took a calculated risk in not excluding it when he made the offer and in permitting it to remain of record as a part of his exhibit. It is significant that at no time did he move to withdraw or exclude the psychiatrists' report which was a part of his exhibit, nor did he at any time call the court's attention to the statutory interdiction against receipt in evidence of the report. It is further significant that defense counsel did not object to the Assistant District Attorney's comment in summation upon the post-crime diagnosis and report.

Certainly, a defendant may waive the adherence by a trial court to the statutory direction that the report of the psychiatrists shall not be received in evidence. It is traditional law

that a defendant, in a criminal case, subject to public policy limitations, may waive the benefit of any statutory provision not relating to the jurisdiction of the court. (See *People* v. *Jacoby,* 304 N. Y. 33, 41; 23 C. J. S., Criminal Law, § 1417.) Here, the defendant's inclusion of the psychiatrists' report in the exhibit as offered by him and his failure to withdraw it constitutes a waiver. Being and remaining through the close of the case as a part of an exhibit in evidence, all counsel had the general right to refer to and explain it, and to use it for any relevant purpose throughout the trial.

The inference to be drawn is that the defendant was deliberately seeking certain advantages which he hoped to gain from the unrestricted use of the Bellevue records, including the psychiatrists' report. Undoubtedly, he hoped to benefit from use of the same in connection with the testimony of his expert and with the cross-examination of the People's experts. Claiming the right to use the same, he may not, on the other hand, unduly restrict the People in a reference to same.

In qualifying the defendant's expert for testimony, defendant's counsel asked him if he had studied the records from the Bellevue Hospital and if he had seen the complete records of the history of Jerry Roth, and he replied that he spent a great deal of time going through these records. It is apparent that the testimony of defendant's expert was based in part upon these records. Therefore, it was quite proper for the Assistant District Attorney to cross-examine him with respect to the same, and counsel for the defendant, in effect so conceded. It is significant that, on the cross-examination of defendant's expert, no objection whatever was interposed by defendant's counsel to the specific inquiries relating to the post-crime hospital report and diagnosis.

The right of the People to use the Bellevue **records, including** the post-crime records, was first challenged during the cross-examination of the defendant. The Assistant District Attorney did then confront the defendant with certain statements set out in the Bellevue records as having been made by him to the psychiatrists designated pursuant to the post-crime commitment. There was then an objection by the defendant generally to the use of the records. This objection, by defendant's counsel, was made merely upon the general ground that it was improper to permit the use of the post-crime records on the cross-examination, but, in connection with such objection, there was no reference by defendant's counsel to the psychiatrists' report. The court then ruled that " this exhibit was admitted in evidence as a whole exhibit. I have given the defense every

opportunity to avail themselves of submitting anything in that booklet in that report. I will afford People the same opportunity." The court further said to defense counsel that it was admitted at the request of defense counsel "as being a part of an official exhibit of this court and I am permitting the district attorney to use it just as I have permitted you." It is significant that defense counsel's position then was merely that "we can't have expert testimony on anything subsequent to November 24, 1958 (the date of the crime)." Thereby, he pinpointed the grounds of his objection. These grounds, not being tenable (see post), were properly overruled.

There were particular objections interposed by defendant to use of the post-crime Bellevue records, and to a reference to the psychiatrists' report, in connection with the direct examination of Dr. Weiss called by the People in rebuttal. This doctor had been one of the two psychiatrists designated pursuant to statute to examine and report upon defendant's competency to stand trial. The People were entitled to use him as an expert upon the trial on the insanity issue. (See *People* v. *Butchino,* 13 A D 2d 183.) It is true that, in the direct examination of this doctor, the People did make repeated reference to the entries in the Bellevue Hospital records including the post-crime records. Under the circumstances, bearing in mind that these records were put into evidence by the defendant with portions therefrom read by his counsel to the jury and that the defendant's expert had used them as the basis for his testimony, the use of them by the Assistant District Attorney in connection with the testimony of Dr. Weiss was permissible. (Cf. *People* v. *Workman,* 283 App. Div. 1066, affd. 308 N. Y. 668; *Hayden* v. *Palmer,* 2 Hill 205, 209–210; 1 Wigmore, Evidence [3d ed.], § 18, pp. 344–345).

There were, on the direct examination of Dr. Weiss, certain references and questions relating to the January 20, 1959 section 662 report which he had signed as one of the designated psychiatrists. Certainly, these references and questions were improper insofar as they tended to place the "substance of the report of the psychiatrists before the jury by indirection". (*People* v. *Draper,* 278 App. Div. 298, 304, affd. 303 N. Y. 653, *supra; People* v. *Butchino, supra,* p. 185.) But the defendant, having placed in evidence the post-crime hospital records, including the report, was not specifically objecting to the reference to the report. For instance, when the doctor testified that he had rendered the report in conjunction with a colleague, there was no objection by the defendant to the question or to the answer. Such objections as were made by the defendant were not placed upon the ground that the report should be barred

from consideration because of the statutory interdiction. Rather, his objections were placed upon the general ground that any question as to the post-crime mental condition of the defendant was not within the purview of the indictment. This was the position of the defendant's counsel all along, and, on basis thereof, he particularly objected to any testimony of Dr. Weiss as to the mental condition of the defendant as of the date of the report. As he pressed his objections, there were conferences at the Bench. It is significant that, following the objections and conferences, the doctor did not testify as to the contents of the report, nor as to the mental condition of the defendant as of the date of the report. And the question finally put to the doctor was proper, namely "Was this defendant Jerry Roth laboring under such a defect of reason as, (1) not to know the nature and quality of the act he was doing and (2), not to know that the act was wrong." The objection to this question was solely upon the ground that the doctor had said that any opinion he would give would include the examinations up to and including January 20, 1959; and the objection based upon that ground was properly overruled.

It was clearly proper to allow Dr. Weiss, as the basis for his opinion, as to the mental condition of the defendant as of the time of the crime, to consider and refer to the post-crime mental condition of the defendant. "Since mental disorder is not a thing of a moment, but usually requires more or less time to develop, it is competent, in order to prove the defendant's responsibility or irresponsibility at the time of the crime, to introduce evidence of his mental condition before and after that time. The prior or subsequent mental condition must not be too remote from the time of the crime, but no general rule can be laid down to determine how remote the evidence may be. Much depends upon the character of the particular evidence offered, and the nature of the unsoundness alleged. * * * The admissibility of prior or subsequent mental condition is therefore in each instance a matter resting largely in the discretion of the trial court." (Weihofen, Mental Disorder As A Criminal Defense, p. 323; see, also, 2 Wigmore Evidence [3d ed.], § 233; *People* v. *Hoch,* 150 N. Y. 291.)

To summarize, the post-crime Bellevue Hospital records, including the copy of the diagnosis by the court-appointed psychiatrists, were before the court and jury because of being part of an exhibit offered by defendant. His counsel took the position that he was not to be limited in the use of the records. Certainly, it was his duty to make his position clear when the court announced that it was receiving and permitting to be read all portions of the record. Instead, he made no objection;

and at no time did he specifically object to the psychiatrists' diagnosis being in evidence. His objections to the use of the Bellevue post-crime records, including incidental reference to the psychiatrists' diagnosis and report were, as heretofore indicated, directed to the untenable general ground that post-crime mental condition was not competent or relevant. If the court committed error in connection with the receipt and allowance of references to the psychiatrists' diagnosis and report, it was led into the same by action of defendant's counsel.

This is a case where incompetent evidence made its way into the record, and was consequently referred to and considered, because of the trial tactics of defense counsel. Such counsel, at the very opening of defendant's case, elected to pursue a course charted upon the court and jury having before it all of the hospital records, including the post-crime records and psychiatrists' diagnosis thereon. He did not during the trial change his course to the extent of taking a position that the statute prohibited consideration of the post-crime psychiatrists' diagnosis and report. Certainly, he is not entitled to a reversal and new trial on the ground that this course, which he deliberately chose to take, has worked against him. (See *People* v. *Cummins*, 209 N. Y. 283; *Johnson* v. *United States*, 318 U. S. 189.) And particularly significant is the fact that the defendant made no objection and took no exception which the trial court should reasonably be expected to construe as referring to the provisions of section 662 now invoked by defendant as ground for reversal. As a matter of law, the point now raised was not saved for review.

In view of the foregoing and the clear evidence that the defendant was responsible for the crime charged, and upon the evidence in the record supporting the finding that, beyond a reasonable doubt, the defendant knew the nature and quality of his act and knew that it was wrong, the judgment of conviction should be affirmed upon the law and the facts.

VALENTE, J. (dissenting). Defendant, convicted of the crime of murder in the first degree, with a recommendation of life imprisonment, has been sentenced to State prison for the term of his natural life. Although the record in this case leaves little doubt that defendant brutally killed a 10-year-old girl while attempting to rape her, there is a serious question as to whether the conviction should stand in view of the submission to the jury of prejudicial, incompetent evidence.

Since the facts proving the commission of the crime are not substantially questioned on this appeal, it becomes unnecessary to recite the gruesome details of the homicide. Unquestionably, on the basis of the evidence, the jury would have been justified in omitting from their verdict the recommendation that the defendant be imprisoned for the term of his naural life. That the recommendation was made only after inquiry by the jury whether, if made, such recommendation would insure that defendant would, under no circumstances, be released from prison and would die there, indicates that the jury had some reservations as to defendant's sanity at the time he committed the crime.

The slaying occurred at about 1:00 P.M. on November 24, 1958 and the defendant was apprehended within a few hours thereafter. He was arraigned in the Magistrates' Court the following day, after he had made several incriminating statements and had confessed his guilt. The Magistrate committed defendant to Bellevue Hospital for observation in order to determine whether he was in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or making his defense. (Code Crim. Pro., § 870.) On December 5, 1958 — while the examination at Bellevue Hospital was in progress — the Grand Jury of Bronx County returned an indictment charging him with murder in the first degree. Thereafter, on January 20, 1959, upon completion of the examination of defendant at Bellevue Hospital, a report was transmitted to the court by the psychiatrists (Code Crim. Pro., §§ 662, 870) finding that he was capable of understanding the charge against him and of making his defense. On February 17, 1959, defendant entered a plea of not guilty with a specification of insanity.

Practically the sole contested issue on the trial was the legal insanity of the defendant at the time of the commission of the crime. The defendant testified in his own behalf; and in support of his specification of insanity, called a psychiatrist who testified that in his opinion the defendant was insane at the time of the commission of the crime under the standards of the McNaughton Rule, now incorporated in section 1120 of the Penal Law.

Upon the cross-examination of the defendant, the Assistant District Attorney confronted him with the admissions he had made to the psychiatrists in the course of the examination at Bellevue Hospital pursuant to the section 870 commitment. The official report of the psychiatrists, transmitted pursuant to section 662 of the Code of Criminal Procedure, contained a sum

mary of defendant's answers to questions propounded by the psychiatrists, which answers, among other things, admitted the commission of the crime and gave details thereof. These incriminating answers were also noted in the hospital records, incident to this report, under the dates when made. Both the report of the psychiatrists and the hospital records were used by the People in the cross-examination of defendant's psychiatrist.

In rebuttal, the People called two psychiatric experts who testified as to defendant's legal sanity at the time of the commission of the crime. One of these witnesses, Dr. Weiss, was one of the two psychiatrists who had examined defendant pursuant to the commitment under section 870 of the Code of Criminal Procedure and had reported to the court pursuant to section 662. In the course of the examination of Dr. Weiss, the People made repeated reference to the official report and to the entries in the hospital records incidental thereto. The avowed purpose in so utilizing the report and records was to support the People's contention that if defendant were sane shortly after his arrest, he must have been sane at the time of the homicide. Moreover, in the charge to the jury, the court alluded to the psychiatric examination conducted four days after the homicide.

Section 662 of the Code of Criminal Procedure provides: '' The report of the psychiatrists made pursuant to this section shall not be received in evidence upon the trial of the defendant ''. The use of the official psychiatric report and the hospital records incidental thereto on the trial of the defendant not only violated the express language of section 662, but was contrary to the pervading purpose and spirit of section 658 *et seq.* of the Code of Criminal Procedure. Consideration by the jury of such incompetent evidence on the issue of defendant's sanity under section 1120 of the Penal Law was so prejudicial as to result in an unfair trial, and, in the interests of justice, the judgment of conviction should be reversed and a new trial ordered.

Sections 658 to 662 of the Code of Criminal Procedure provide the procedure to ascertain before final judgment whether a defendant indicted for a felony or a misdemeanor is in such a state of idiocy, imbecility or insanity that he is incapable of understanding the charge, indictment or proceedings or of making his defense. Similar procedures are available to the Court of Special Sessions and the Magistrates' Court under sections 870 to 875 of the Code of Criminal Procedure. So, too, section 658 permits a court, upon its own motion, or that of the District Attorney or the defendant, to order a defendant

to be examined to determine the question of his sanity where a defendant makes a plea of insanity to the indictment. But the distinction must be noted between the sanity which is probed in an examination under section 658, and that which forms the basis for criminal responsibility under section 1120 of the Penal Law. In the former a determination is made as to the ability to understand the nature of the proceedings and to make a defense, while in the latter it is a question of knowing the nature and quality of the act and that it was wrong.

Section 659 provides for the appointment of two psychiatrists by the Director of the Division of Psychiatry of the Department of Hospitals. The examiners are authorized to interrogate not only the defendant, but also witnesses whose attendance may be compelled.

The obvious import of section 658 *et seq.* of the Code of Criminal Procedure is to make available to a court a method to determine whether further proceedings in a pending prosecution should be stayed because of a defendant's mental condition. From the involuntary nature of the proceedings, it would clearly follow that any incriminating statements or admissions made by a defendant in the course of such an examination, if offered by the People at a trial, would properly be subject to an objection of testimonial compulsion. When we consider the procedures under a section 658 examination, the People can, in no event, avail themselves of any of the statements made in the course of such examination as evidence-in-chief in any prosecution. As already noted hereinabove, section 662 expressly makes the transmitted report of the psychiatrists inadmissible in evidence upon the trial of the defendant.

In *People* v. *Draper* (278 App. Div. 298, affd. 303 N. Y. 653) a conviction was reversed because the prosecution was permitted to place before the jury the findings of the psychiatrists appointed under section 658. Similarly, in *People* v. *Colavecchio* (11 A D 2d 161) the court, per BASTOW, J., declared that not only was the report of the psychiatrists inadmissible under section 662 of the Code of Criminal Procedure, but that the statute could not be circumvented by having the psychiatrists testify to the contents of the report. However, in both cases the court indicated that the hospital record, incidental to the report, could be offered by the defendant. In *Colavecchio* it was specifically held that the defendant would have the right to use the testimony of the psychiatrist who had examined the patient to show lack of specific intent to commit the crime charged.

The statute does not specifically prohibit a psychiatrist, who has made a section 658 examination from testifying at a trial as an expert as to a defendant's criminal responsibility. However, in *People* v. *Butchino* (13 A D 2d 183; 185), the court stated, per BERGAN, P. J.: "Although the examination as a witness on the trial of a psychiatrist who made a section 658 examination is not prohibited by statute, if it is done it should be under carefully prescribed conditions and ordinarily be avoided if there is available to the People alternative medical proof, in view of the fact that the official report of such a physician is expressly by statute made inadmissible on the trial."

Irrespective of any privilege of the People to call Dr. Weiss as a witness on the trial of the defendant—and I am of the opinion that no such privilege existed—the fact remains that he was so called and did testify as to defendant's criminal responsibility. But added to the questionable use by the People of Dr. Weiss as an expert, was his prejudicial testimony as to the contents of the report transmitted on the section 870 examination of the defendant and as to the notes of this examiner made in the hospital records incidental to the examination. What is more, Dr. Weiss was permitted to express an opinion as to defendant's legal sanity at the time of the commission of the crime predicated on the report and the records made incidental thereto. All of this constituted reversible error. (*People* v. *Draper, supra*; *People* v. *Colavecchio, supra*; *People* v. *Samuels,* 302 N. Y. 163; Code Crim. Pro., § 662.)

An examination of the hospital records incidental to the defendant's section 870 commitment reveals that he was extensively questioned by a team of psychiatrists at different times. The notes also show that his mother, his sister, and his wife were examined and the answers they gave also entered. The records also indicate that the defendant was administered sodium amytal—a so-called "truth drug"—on 14 days of his stay there. When we consider that the defendant was involuntarily committed by the Magistrate (no counsel present) for the purpose of this examination, the conclusion is inescapable that the use by the People of any incriminating statements made by the defendant in the course of such an examination violated the defendant's constitutional rights. The fact that he made incriminating admissions, and confirmed his guilt prior to his commitment, can nowise condone the use of this hospital record.

The defendant was entitled to have the question of his sanity submitted to the jury for determination, free of the official

report of the hospital, the records incidental thereto and of the testimony. of the examining psychiatrist. The failure to so submit the case resulted in an unfair trial.

Additionally, the People should not have been permitted to argue to the jury that because the defendant was not in such a state of idiocy, imbecility or insanity as to be unable to prepare his case that he must have been legally sane at the time of the commission of the crime. Section 658 of the Code of Criminal Procedure and section 1120 of the Penal Law contemplate different norms. Capacity to understand the nature of the charge and to defend is no proof that the defendant knew the nature and quality of his act and that it was wrong. Under section 1120 of the Penal Law, a defendant is not excused from criminal liability because he was an idiot, imbecile or insane person if the People are able to prove that at the time of the commission of the crime he knew the nature and quality of his act and that it was wrong.

The People attempt to justify the use of the report and the hospital records incidental thereto because of the offer and receipt in evidence of defendant's Exhibit I, the Bellevue Hospital record concerning the defendant. This record was offered by defense counsel in support of the specification of insanity. Prior to the defendant's commitment to Bellevue Hospital under section 870, the defendant had an institutionalization experience that began when he was seven years of age and lasted almost continuously thereafter until his release from Kings Park State Hospital on October 22, 1950. During this period he was at Hawthorne, Cedar Knolls School from August 31, 1943 to April 1, 1948; in Bellevue Hospital by court order on three different occasions apart from the section 870 commitment; the Children's Shelter, Edenwald School and Kings Park State Hospital from which he was discharged on October 22, 1951 with a final diagnosis of "Dementia Praecox: Childhood Schizophrenia."

Defendant's Exhibit I consisted of the records of the defendant's stay at Bellevue Hospital on the three occasions prior to the section 870 commitment. It also contains the hospital record incident to the section 870 commitment and a copy of the official report of the psychiatrist.*

The majority of this court agree with the contention of the People that the defendant's Exhibit I was offered without limitation by the defense and that the People therefore were entitled to use any part of it. This, however, would not justify

---

* Section 662 makes no provision for incorporating a copy of the report into the hospital record of the examinations.

the use by the People of the official report of the psychiatrist which is interdicted by section 662 of the Code of Criminal Procedure (*People* v. *Draper, supra*; *People* v. *Colavecchio, supra*).*

As I read this record, there is considerable doubt as to whether the defendant intended to offer as part of defendant's Exhibit I the Bellevue Hospital record incident to the section 870 examination. Defense counsel offered the Bellevue Hospital records in evidence and used the following language: "I offer in evidence records of Bellevue Hospital of the defendant Jerry Roth." There followed a discussion between court and counsel. The District Attorney stated that it was his understanding that everything in the record was going to be permitted. The court replied, "I don't know yet. The record has been marked in evidence. I have no way of deleting parts of that. It is impossible." After the District Attorney explained why he made no objection, the court stated: "No, I'll permit this statement to go in. As they arise I'll rule on them." The District Attorney then proceeded to use the section 870 report (a copy of which was improperly part of the hospital record) and other parts of the record incident to that commitment. The defense attorney's prompt and proper objections to each and every use thereof were overruled.

On balance, I would say that the record leaves considerable doubt as to the scope and meaning of the court's ruling and, this being a capital case, I would resolve that doubt in favor of the defendant.

Even if it be that the defense did offer the section 870 hospital record, nevertheless timely objection was made when the People attempted to use it. That objection, in the interest of justice, should have been sustained. Everything in that record was damaging to the defendant and, if his counsel inadvertently offered it, the defendant should not have been penalized by permitting it to be used in the face of a timely objection. The trial of a criminal case is not like a chess game where once a chessman has been moved, and the hand lifted away, the move is irrevocable. Assuming that defense counsel did offer the hospital record, incident to the section 870 examination, the fact remains he realized his mistake in time and, as the People were about to act on it, he objected. The court was not without power to prevent its use and, in the interest of justice and of a fair trial, the defense's objection should have been sustained.

---

* From the language of section 662, it is questionable if even the defendant can use the report at the trial of an action.

To recapitulate then, the submission to the jury of the official report of the psychiatrist and the hospital records incidental thereto, to be considered in their deliberation as to defendant's criminal responsibility, was prejudicial error and resulted in an unfair trial. The error affected substantial rights of the defendant and may not be disregarded.

In the language of *People* v. *Ochs* (3 N Y 2d 54, 57) per FROESSEL, J., the error is one that: " tends to blur an important issue and prevent a proper consideration thereof by the jury, or which may have misled the jury and influenced them in reaching their verdict * * * and may not be disregarded even though the evidence may convince us of the defendant's guilt [cases cited]."

Whatever we may think of his connection with the crime, defendant was entitled to a fair trial according to law. (*People* v. *Mleczko*, 298 N. Y. 153, 163.)

I would therefore reverse the conviction and grant a new trial.

BOTEIN, P. J., STEVENS and BERGAN, JJ., concur with EAGER, J., VALENTE, J., dissents in opinion.

Judgment of conviction affirmed.